**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MALIK AARON, an individual, GREGORY KIM, a minor, by and through his guardian ad litem, Angel Rufuerzo,

                    Plaintiffs,

      v.

TARGET CORPORATION, a Minnesota corporation; COUNTY OF LOS ANGELES, a public entity; VINCENT KRUSE, an individual; RAFAEL MEJIA, an individual; MICHAEL RUSSELL, and individual; and DOES 1 through 50, inclusive,

                    Defendants.

Case No.: 2:22-cv-01237-MEMF-JPR

**ORDER DENYING DEFENDANT TARGET CORPORATION [ECF NOS. 49, 52] AND GRANTING IN PART DEFENDANT COUNTY OF LOS ANGELES, RAFAEL MEJIA, AND MICHAEL RUSSELL'S [ECF NO. 50, 56] MOTIONS FOR SUMMARY JUDGMENT**

     Before the Court are the Motions for Summary Judgment or, in the Alternative, Partial Summary Judgment (the "Motions") filed by (1) Defendant Target Corporation ("Target"); and (2) County of Los Angeles (the "County"), Rafael Mejia, and Michael Russell (collectively, the "County Defendants"). ECF Nos. 49, 50, 52, 56. For the reasons stated herein, the Court hereby DENIES Target's Motion (ECF No. 49, 52) and GRANTS IN PART the County Defendants' Motion for Summary Judgment (ECF No. 50, 56).

1

**BACKGROUND**

I.   Background

    A.   Factual Background

On January 17, 2021, three men robbed a Target store and fled. Target detained Plaintiffs Malik Aaron and Gregory Kim, as well as their friends, and called the police. Officers Mejia and Russell (the "Deputies") of the Los Angeles County's Sheriff's Department ("LASD") arrived on the scene and confronted Aaron and Kim. Aaron and Kim allege that Target violated their civil rights and the County through the Deputies violated their constitutional rights. Defendants deny all allegations and assert that their actions were lawful.

    B.   Procedural History

Aaron and Kim ("Plaintiffs") filed their initial complaint in Los Angeles County Superior Court on January 14, 2022, and Target removed the action to this Court on February 23, 2022, on the basis of federal question jurisdiction. ECF No. 1 ("Notice of Removal"). On June 17, 2022, the parties stipulated to allow Plaintiffs to amend their complaint, which the Court granted on June 27, 2022. ECF No. 18, 19. On July 13, 2022, Plaintiffs filed the First Amended Complaint, which is the operative complaint in this case. ECF No. 22 ("FAC").

The FAC brings forth causes of action against Target for: (1) Violation of the Unruh Act, (2) Violation of the Bane Act, (3) Violation of the Ralph Act, (4) False Imprisonment, (5) Negligence, (6) Defamation, and (10) Declaratory and Injunctive Relief;[1] it also brings forth causes of action under 42 U.S.C. § 1983 against the County Defendants, as well as Deputy Vincent Kruse, for: (7) Excessive Force; (8) Municipal Liability under *Monell*; and (9) Unlawful Detention. *Id.* On July 28, 2023, the parties stipulated to dismiss Deputy Kruse from the action. ECF No. 51.

On July 26, 2023, Target filed notice of its Motion for Summary Judgment. ECF No. 49. On July 27, 2023, the County Defendants filed notice of their Motion for Summary Judgment. ECF No. 50. In compliance with the Court's standing order, the parties thereafter filed their joint briefs.

---

[1] The numbering used by the Court herein refer to the claim's respective Cause of Action in the FAC.

1    Target and Plaintiffs submitted their joint brief on Target's Motion for Summary Judgment

2    on August 16, 2023. ECF No. 52 ("Target MSJ"). They also submitted a Joint Appendix of Evidence

3    and Joint Statement of Uncontroverted Facts. ECF Nos. 52-1 ("Target Appendix"); 54 ("Target

4    SUF").[2] Target submitted objections to Plaintiffs' submitted evidence. ECF No. 55 ("Evidentiary

5    Objections").

6    The County Defendants and Plaintiffs submitted their joint brief on the County Defendants'

7    Motion for Summary Judgment on August 17, 2023. ECF No. 56 ("County MSJ"). They also

8    submitted a Joint Appendix of Evidence and Joint Statement of Uncontroverted Facts. ECF Nos. 57

9    ("County Appendix"); 58 ("County SUF").[3]

10    The Court heard both Motions on October 19, 2023.

11    **II.**    **Applicable Law**

12    Summary judgment should be granted if "the movant shows that there is no genuine dispute

13    as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

14    56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists &*

15    *Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*,

16    477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could

17    return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

18    A court must view the facts and draw inferences in the manner most favorable to the non-

19    moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil*

20    *Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of

21    persuasion at trial—usually, but not always, a defendant—has both the initial burden of production

22    and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine*

23    *Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the

24    moving party must either: (1) produce evidence negating an essential element of the nonmoving

25

26

27    [2] The Court will refer to facts set forth by Target as "TSUF" and facts set forth by Plaintiffs as "PSUF" throughout this order.

28    [3] The Court will refer to facts set forth by the County Defendants as "CSUF" throughout this order.

party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

Where a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its burden of production, the burden shifts to the nonmoving party to produce evidence showing a genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is no genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252.

4

1    To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate

2  that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*,

3  477 U.S. at 323.

4    **III.    Findings of Fact[4]**

5    The Court finds the following material facts are established for trial under Federal Rules of

6  Civil Procedure 56(a) and 56(g):

7    **A.  Plaintiffs Enter the Store**

8    At 6:58 p.m. on January 17, 2021, three Black men (the "Thieves") approached the entrance

9  of the Target store in Westlake Village, California (the "Store"). TSUF 1; PSUF 3. The first wore a

10  black hoodie with the hood up and a backpack. TSUF 2, 4. The second wore a grey hoodie with the

11  hood up. TSUF 3. The third wore a black hoodie with the hood up. TSUF 2. All three were

12  approximately five feet and nine inches to six feet tall. TSUF 6. At the time, due to the Covid

13  pandemic, the Thieves, and all customers and employees in the Store, were wearing face coverings.

14  TSUF 5; ECF No. 52-1, Declaration of Caitlin E. Higgs ("Higgins Decl."), Ex. D-1.[5]

15    Aaron and Kim approached the Store with three of their friends (the "Teenage Shoppers") at

16  6:59 p.m. and entered the store three seconds after the Thieves. TSUF 11.[6] This group consisted of

17  Aaron and Kim, who are both Black teenage boys, another Black teenage boy, one white teenage

18  girl, and one Latina teenage girl. PSUF 1; TSUF 21. The three Black teenage boys among the

19  Teenage Shoppers all wore black clothing, and Kim wore a backpack. TSUF 13-16. Like everyone

20

_____

21  [4] The facts set forth below are taken from Target and the County Defendants' Joint Statement of Facts and the

22  submitted evidence. *See* ECF Nos. 52-1, 57. To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below

23  were allegedly disputed by the opposing party, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute.

24  In making these Findings of Fact, the Court considered Target's Evidentiary Objections. ECF No. 55. The

25  Court did not find any evidence that Target objected to essential to finding any fact stated herein, and therefore need not reach its objections.

26  [5] The Court notes that Ex. D-1 is presented as a demonstrative, but references it as it finds that it accurately transcribes the words being stated in Ex. D, the 911 call, itself.

27  [6] While the parties do not dispute this fact, the Court notes that in the video itself, the Teenage Shoppers

28  appear to enter around fifteen seconds later after the previous group of three individuals. *See* Declaration of J. Bernard Alexander, III ("Alexander Decl."), Ex. 9 ("Entrance Video").

else in the Store, all of the Teenage Shoppers wore face masks. TSUF 12. On January 17, 2021, Kim was 16 years old and approximately five feet nine inches tall; Aaron was 17 years old and between approximately five feet and seven inches to five feet and ten inches tall in height. TSUF 17, 19, 20.

### B. Events Leading up to the Deputies Arrival

After entering the Store, both the Thieves and the Teenage Shoppers were headed in the same direction toward the back of the Store. TSUF 22. The Thieves went to the back of the Store and then turned right, toward the technology department. TSUF 23. the Teenage Shoppers headed toward the back, but turned right before reaching the back, walked through the clothes section, and continued to the snack section. TSUF 24. The snack section is in the back right corner of the Store, and approximately 50 feet from the Store's emergency exit. TSUF 25, 26.

The Thieves stole three phones and a tablet and caused the Store's display alarm to go off. TSUF 31. Target employee Nathan Cribari called out over the Store's walkie-talkie system, which any employee in the Store with a walkie-talkie on the default channel could hear, that there were "three guys stealing displays." TSUF 32. Two of the Thieves ran towards the emergency exit at the back of the Store. TSUF 33. Cribari followed them and described the two men's location via walkie-talking. TSUF 33. At approximately 7:00 p.m., Target employee Shanon Gutierrez, who was working at check stand four, heard Cribari shout that phones were being stolen. TSUF 50, 51. Shortly after Cribari's announcement, Gutierrez heard another male voice state on the channel that the people who had stolen the phones were still in the Store, and that the suspects had left the electronics section and were three men wearing dark clothing. TSUF 52.

When Cribari returned to the electronics section, the third man was no longer there. TSUF 34. Cribari began to check the aisles to find the third Thief, and saw the Teenage Shoppers near the bedding section. TSUF 35, 36. Cribari continued walking to other sections of the store, during which time someone called out over the walk-talkie channel that a group of guys were walking between the bath and bedding sections, referring to the Teenage Shoppers. TSUF 38. Cribari responded that "It wasn't them." TSUF 38.

After the walkie-talking announcements, Target asset protection employee, Noemi Mitchell, ran out of the break room near the front of the Store and headed toward the back of the Store. TSUF

53. A few minutes later, Mitchell came back to the front of the Store on the phone with 911, reporting that the Store had just been robbed. TSUF 55, 56. Mitchell reported that a group ran out the back door, "but there's still a group inside the store." TSUF 57; Higgins Decl., Ex. D. Mitchell handed the phone to Target employee Sergio Rosales, who reported to 911 that "there's a group that's still with [the Thieves] in the store." TSUF 58, Ex. D.

After the walkie-talkie announcements, Target employee Kayla Prince instructed others to block the front doors with carts, and employee Michael Dunne placed carts across the exit for approximately three and a half minutes. TSUF 54. Dunne and Gutierrez allowed customers to exit from the front as needed while the door was blocked. TSUF 54. Mitchell told Gutierrez and Dunne to move the carts away from the door after she came back to the front of the Store, and they complied. TSUF 59.

When the alarms went off in the Store, the Teenage Shoppers were near the bakery section and heading towards the snack aisle. TSUF 40, 42. Three to five minutes after the alarm went off, the Teenage Shoppers encountered a Target employee in the snack aisle. TSUF 42. The Teenage Shoppers had an interaction with the Target employee and made their way to the front of the Store. TSUF 44. The carts placed by Gutierrez and Dunne were already removed from the door by the time the Teenage Shoppers arrived at the front of the Store, at approximately 7:09 p.m. TSUF 60, 61.[7] No customers exited through the front of the Store from the time the Teenage Shoppers arrived there until the deputies arrived at 7:11 p.m. TSUF 62. Customers other than the Plaintiffs left as soon as the Deputies arrived a couple minutes later. Higgins Decl., Ex. I at 8:12.

### C. Events After the Deputies Arrived

At approximately 7:11 p.m., several deputies from LASD, including Deputies Mejia and Russell, responded to a call reporting a crime of grand theft, and arrived at the Store. CSUF 1. As the Deputies entered the Store, they spoke initially to Target employees who pointed to the Teenage

---

[7] Plaintiffs dispute this fact on the basis it is not clear from the video, but the Court finds that this is clearly established from both the evidence Target cites as well as from Ex. I. Higgins Decl., Ex. I at 6:25. While it appears that Target employees may have started to attempt to move the carts back when Plaintiffs arrived at the front of Store, the carts were never actually placed back in front of the entrance and never physically blocked Plaintiffs from the entrance. *Id.*

1   Shoppers.[8]. CSUF 8. The Deputies told the Teenage Shoppers that they could not leave because they

2   had to investigate the robbery and they were just trying to figure out what was going on. CSUF 9.

3        Aaron began filming the exchange with his cell phone, and Deputy Russell approached him.

4   CSUF 11. As Russell approached Aaron, Aaron backed up from him and put his hands out in front

5   of him. CSUF 12. Aaron's phone dropped to the floor during this encounter. CSUF 13.[9] Shortly

6   after, Aaron backed up into Mejia, who had approached him from behind, and Mejia explained to

7   Aaron that he was being detained. CSUF 33. Mejia used a firm grip on Aaron's arm and took him

8   towards one of the registers. CSUF 34. Aaron was handcuffed by Mejia, who then escorted Aaron

9   out of the Store to the patrol vehicle. CSUF 37. Mejia put Aaron in the patrol vehicle, where Mejia

10  attempted to close the door several times before finally closing it. CSUF 41, 42. Aaron was in the

11  patrol vehicle for approximately 23 minutes while LASD conducted the investigation. CSUF 44.

12       While Mejia was detaining Aaron, Russell told Kim that Kim was being detained and

13  instructed him to turn around and put his hands behind his back. CSUF 22. Kim turned around and

14  Russell held his wrists behind his back, telling Kim that he would let Kim go if he complied. CSUF

15  23. Kim complied and was never handcuffed. CSUF 24. Russell told Kim to sit next to a cash

16  register in the bagging area for approximately two and a half minutes unattended. CSUF 27. Kim

17  was then escorted outside the Store, and told to sit in front of the Store on a planter ledge, where he

18  sat for approximately twenty minutes. CSUF 28–30.

19       LASD determined that there was no evidence that the Teenage Shoppers had been involved

20  in the crime, and they were released. CSUF 46.

21       / / /

22       / / /

23

24  ───────────────

25  [8] This is evident from the video evidence.

26  [9] Plaintiffs allege that Russell grabbed Aaron's wrist and caused his phone to drop. CSUF 13. Although the
    County Defendants present this allegation as an undisputed fact, it appears they dispute that this happened,
27  arguing that Aaron's phone had already fallen before Russell made contact. CSUF 14, 19. However, the Court
    finds that based on the video, it is unclear what caused Aaron's phone to drop. ECF No. 57, Declaration of
    Elise H. Hur ("Hur Decl."), Ex. L at 9:39. It appears that Russell does reach out, and from the angle it cannot
28  be clearly determined that he did not grab Aaron's hand. *Id.*

**IV.**   <u>**Discussion**</u>

The Court first addresses Target's Motion, and finds that there are disputed issues of fact with regards to Plaintiffs' First, Second, Third, Fourth, Fifth, Sixth, and Tenth Causes of Action. Accordingly, the Court DENIES Target summary judgment in its entirety.

Next, as to the County Defendants' Motion, the Court finds that there are disputed issues of fact with regards to Plaintiffs' Seventh Cause of Action and DENIES the County Defendants summary judgment as to that claim. The Court GRANTS the County Defendants summary judgment as to the Eighth and Ninth Causes of Action.

**A.**   **There are disputed issues of material fact with respect to Plaintiffs' Unruh Act Claim (First Cause of Action)**

California's Unruh Civil Rights Act provides that no person should be denied full accommodations, advantages, facilities, privileges, or services in any business establishment based on a protected characteristic, including race. Cal. Civ. Code 51(b). "Absent an ADA violation, the Unruh Act requires allegations supporting 'willful, affirmative misconduct' with the specific intent 'to accomplish discrimination on the basis of [a protected trait].'" *Martinez v. Cot'n Wash, Inc.*, 81 Cal. App. 5th 1026, 1036 (2022). Target argues that based on the undisputed facts, Plaintiffs' encounter in the snack aisle with the Target employee was not motivated by race because this employee talked to Plaintiffs' group as a whole, which consisted of black, white, and Hispanic members. Mot. at 17. However, Plaintiffs' Unruh Act claim is not so limited to being asked to leave the Store and not loiter in that one instance. Both in the operative Complaint and Plaintiffs' interrogatory responses, Plaintiffs assert that their Unruh Act claim is based on Target's alleged racial profiling of them throughout the whole encounter, which led to Target pointing them out as suspects to the LASD. FAC at ¶ 26; Higgins Decl. Exs. J-K ("Interrogatory Reponses"), No. 10 ("Upon arrival of the [LASD], Plaintiff[s] observed a Target security guard pointing Plaintiffs out" and were "treated as presumed criminals solely of their race").

Here, based on the undisputed facts, it is unclear what connection, if any, Plaintiffs' encounter with the Target employee in the snack aisle has with the alleged racial profiling that led to them being suspected of being part of the theft. A jury could find that these were isolated events, as

if Target employees suspected Plaintiffs of being involved with the theft, they would presumably not be asked to leave. Regardless, Target has failed to show that there is no reasonable dispute of fact as to whether any other conduct outside of the snack aisle towards Plaintiffs may have been racially motivated. Target appears to argue throughout the brief that it was reasonable for Target employees to assume that Plaintiffs were involved with the crime because they looked similar to the Thieves, and therefore could have been serving as decoys. While a jury could find this, the Court finds that this is reasonably in dispute—a reasonable jury could also find that Target employees assumed that Plaintiffs were involved with the crime because of their race.[10] Further, Plaintiffs were denied equal advantages that day compared to other Target customers as they were specifically singled out by Target as potential accomplices to the Thieves, such that they were detained and pointed out to the LASD as suspects.[11]

Accordingly, the Court finds that there is a material dispute of fact with regards to Plaintiffs' Unruh Act claim and DENIES summary judgment as to Plaintiffs' First Cause of Action.

**B.      There are disputed issues of material fact with respect to Plaintiffs' Bane Act Claim (Second Cause of Action)**

Defendants bring summary judgment as to Plaintiffs' Bane Act claim, which provides that Target may not use a "threat, intimidation, or coercion" to interfere with the exercise of a person's constitutional right. Cal. Civ. Code § 52.1. "The specific intent inquiry for a Bane Act claim is focused on two questions: First, '[i]s the right at issue clearly delineated and plainly applicable under the circumstances of the case,' and second, '[d]id the defendant commit the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that

---

[10] At the hearing, Target argued that there is no evidence that any employee ever considered Plaintiffs' race, but the Court finds that there is sufficient circumstantial evidence from which a jury could so find even if there is no evidence that any employee explicitly mentioned Plaintiffs' race. For example, in the 911 call, an employee described the Thieves as being Black. Higgins Decl., Ex. D-1. Therefore, a jury could draw the inference that the employees were considering the race of Plaintiffs as well in associating them with the Thieves, as they singled them out as being involved despite there being numerous other people in the Store, the vast majority of whom were not Black.

[11] At the hearing, counsel for Target conceded that unequal treatment can give rise to an Unruh Act claim, even without a complete denial of services.

right?'" *Sandoval v. County of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018). This specific intent can be shown "'even if the defendant did not in fact recognize the unlawfulness of his act' but instead acted in 'reckless disregard' of the constitutional right." *Id.*

Here, there is no dispute that Plaintiffs had a right to leave the Store that Target interfered with. Target argues that what is at issue other than the cart blockade is solely speech.[12] Mot. at 18. Speech alone does not support a Bane Act claim unless the speech itself threatens violence, and a plaintiff reasonably fears that because of the speech, violence will be committed against them. Cal. Civ. Code § 52.1(k). However, as an initial matter, the Court finds that the conduct at issue is not just speech, as a jury could find that Target interfered with Plaintiffs' right to leave by physically standing between them and the exit and actually did prevent them from leaving. *See Moreno v. Town of Los Gatos*, 267 Fed. App'x. 665, 666 (9th Cir. 2008) (interpreting that "section 52.1 does not require violence or threat of violence"); *see also Feiger v. Smith*, No. 1:14-cv-01920-DAD-EPG, 2017 WL 431352 at *1 (E.D. Cal. Jan. 31, 2017) ("An allegation of either violence or the threat of violence is only necessary if the alleged violations of the Bane Act are based *entirely* on speech.") (emphasis added). Counsel for Target argued at the hearing that such a theory was not set forth by Plaintiffs as a basis for the Bane Act claim, but the Court finds that this is encompassed by Plaintiffs' prior allegations that Target did not let them leave the Store. *See* Interrogatory Responses, No. 15; *see also* PSUF 12 ("Target employees then blocked Plaintiffs' ability to exit the store . . .").

Moreover, a jury could find that the speech by itself—Target employees telling Plaintiffs that they were not allowed to leave and that the police were coming (TSUF 64)—did threaten violence. *See Black Lives Matter-Stockton Chapter v. San Joaquin County Sheriff's Office*, 398 F. Supp. 3d 660, 680 (E.D. Cal. July 2, 2019) (noting that "courts have consistently held that a threat of arrest from law enforcement can be 'coercion' under the Bane Act, even without a threat of violence per

---

[12] The Court has found as an undisputed fact that the carts did not block Plaintiffs from leaving the Store. *See* fn. 7, *supra.*

se").[13] Finally, a jury could find that Plaintiffs' reasonably feared violence due to this speech given

the circumstances. Plaintiffs were Black teenagers during a time frame where news of police

brutality against people of color was prominent in the media. *See Triton Energy Corp. v. Square D

Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) (explaining that "inferences may be drawn from a

nonmoving party's direct and circumstantial evidence to establish a genuine issue of material fact").

Accordingly, the Court finds that there is a material dispute of fact with regards to Plaintiffs'

Bane Act Claim and DENIES summary judgment as to the Second Cause of Action.

**C.     There are disputed issues of material fact with respect to Plaintiffs' Ralph Act
        Claim (Third Cause of Action)**

Plaintiffs' Third Cause of Action is based on the Ralph Act, which gives every citizen "the

right to be free from any violence, intimidation by threat of violence . . . on account of any

[protected] characteristic . . . or because another person perceives them to have one or more of those

characteristics." Cal. Civ. Code § 51.7(b)(1). A threat of violence under the Ralph Act specifically

includes "making or threatening to make a claim or report to a peace officer or law enforcement

agency that falsely alleges that another person has engaged in unlawful activity . . . knowing that the

claim is false, or with reckless disregard for the truth or falsity of the claim or report." *Id.* §

51.7(b)(2). Here, while the Court again finds that no claim arises from the alleged cart barricade for

the same reasons as discussed previously, the Court also finds that there is a reasonable dispute of

fact as to whether Target made a claim to the Deputies either knowing the claim was false, or with

reckless disregard for its truth or falsity.[14]

---

[13] Counsel for Target appeared to argue at the hearing that *Black Lives Matter* was distinguishable because the
case dealt with the actions of the police themselves, whereas here, Target had a right to call the police under
the merchant's privilege and cannot be vicariously liable for what the police do. As discussed in Section
IV.D, *infra*, there is a genuine dispute of fact as to whether Target's communications to the police were
protected in this instance. Regardless, the Court references *Black Lives Matter* merely for the proposition that
a threat of arrest can be sufficient under the Bane Act. While Target may not have been independently capable
of arresting Plaintiffs, a jury could find that they could accomplish the same end by telling the police that
Plaintiffs were criminals as it was foreseeable that an arrest would result from such a report.

[14] Target references California's litigation privilege but notes that it would not be applicable for false reports
to a law enforcement agency that are made knowing the report is false, or with reckless disregard for the truth
or falsity of the report, which is what is already required by the Ralph Act itself. Civil Code § 47(b)(5); Cal.
Civ. Code § 51.7(b)(2).

Target first argues that its employees reported that Plaintiffs "might" have been involved, which does not arise to making an actual report. Mot. at 24. However, the Court finds this in dispute. Based on the 911 call, a Target employee stated to the operator that "there's a group that's still with [the Thieves] here in the store." Ex. D-1. A reasonable jury could accordingly find that Target employees did affirmatively represent that Plaintiffs were associated with the Thieves. Moreover, it is not clear what was actually said by the Target employees to the Deputies upon their arrival. TSUF 73.[15] Target also argues that any statements were not made by its employees with knowledge of falsity or reckless disregard for the truth, but again, whether the facts amount to a reasonable and good-faith basis for suspicion of Plaintiffs is a factual issue. Plaintiffs have shown that Cribari stated to Target employees that they were not the Thieves, and it was likely that the real Thieves had left the Store already. TSUF 36, Ex. D-1. Target argues in response that this does not rule out that Plaintiffs were associated with the Thieves even if they were not the Thieves themselves, but a reasonable jury could find that Target employees improperly associated Plaintiffs with the Thieves based on their race. While Target presents a number of facts pointing out non-racial physical similarities between the Thieves and Plaintiffs, it is undisputed that both the Thieves and Plaintiffs were Black. PSUF 1, 3. A reasonable jury could find that this was the motivating or primary factor for the association, and if so, a report by Target pointing the Deputies to Plaintiffs could have been made with reckless disregard for the truth, if not knowingly false.

Accordingly, the Court DENIES summary judgment to the Third Cause of Action.

**D.      There are disputed issues of material fact with respect to Plaintiffs' False Imprisonment Claim (Fourth Cause of Action)**

A false imprisonment claim arises where a plaintiff can show "nonconsensual, intentional confinement . . . without lawful privilege, for an appreciable length of time, however short." *Fermino v. Fedco, Inc.*, 7 Cal. 4th 701, 715–16 (1994). "Words or conduct furnishing a reasonable apprehension on the part of the one restrained that he will not be allowed to depart is sufficient." *Schanafelt v. Seaboard Fin. Co.*, 108 Cal. App. 2d 420, 423 (1951). Therefore, even though the

---

[15] Although Target presents this fact, it characterizes it as an allegation only.

1   Court does not find that Plaintiffs were physically restricted from leaving by the cart barricade, the

2   instruction by Target employees to not leave until the police arrived does create a viable false

3   imprisonment claim. A reasonable jury could find that Plaintiffs were told by Target employees that

4   they had to stay, and that even though they wanted to leave, they were not allowed to. TSUF 64, 65.

5   This would be sufficient to assert a detention as a matter of law.

6       Target moves on Plaintiffs' claim arguing that the merchant's privilege applies, which is a

7   complete defense to claims of false imprisonment. Specifically, the privilege allowed merchants to

8   detain a person for a reasonable time when the merchant has "probable cause" to believe that the

9   person has or was attempting to steal merchandise. Cal. Penal Code § 490.5(f)(1); *Fermino*, 7 Cal.

10  4th 701, 716 (1994). "The probable-cause standard is incapable of precise definition or

11  quantification into percentages because it deals with probabilities and depends on the totality of the

12  circumstances," but essentially boils down to whether there "is a reasonable ground for belief of

13  guilt" which "must be particularized with respect to the person to be searched or seized." *Maryland

14  v. Pringle*, 540 U.S. 366, 371 (2003). While the Court finds that the detention itself would be

15  reasonable if probable cause exists, this existence is subject to a reasonable dispute of material fact.

16  Target cites to *Gibson v. J.C. Penney Co.*, 165 Cal. App. 2d 640, 644 (1958) as authority that the

17  existence of probable cause is to be determined as a matter of law, but here, such a determination

18  rests on factual determinations that have yet to be made. Mot. at 28. Here, the issue of fact is

19  whether or not the Target employees suspected Plaintiffs with a reckless disregard for whether

20  Plaintiffs actually committed any crime. A jury could find based on the facts that Target knew and

21  could confirm that Plaintiffs were not the Thieves, and therefore a reasonable dispute of fact exists

22  as to whether Target's theory of Plaintiffs' involvement arises from any individualized suspicion of

23  Plaintiffs, rather than purely racial profiling. *Ybarra v. Illinois*, 444 U.S. 85, 86 (1979) ("[A]

24  person's mere propinquity to others independently suspected of criminal activity does not, without

25

26

27

28

1    more, give rise to probable cause . . .”). Therefore, the Court cannot yet rule as a matter of law

2    whether probable cause existed.[16]

3         Accordingly, there is a triable issue of fact as to this claim, and the Court DENIES summary

4    judgment as to the Fourth Cause of Action.

5         **E.**     **There are disputed issues of material fact with respect to Plaintiffs' Negligence**

6             **Claim (Fifth Cause of Action)**

7         Target moves on Plaintiffs' claim of negligence under Civil Code section 1714, which

8    provides that a defendant is responsible for injury caused by "his or her want of ordinary care or skill

9    in the management of his or her property or person, except so far as the latter has, willfully or by

10    want of ordinary care, brought the injury upon himself or herself." Civil Code § 1714(a). Here,

11    Target argues that it owed no duty of care to Plaintiffs to ensure that LASD treated them properly.

12    However, again, Target misconstrues the scope of Plaintiffs claim. As Target notes, Plaintiffs have

13    alleged that Target breached its duty of care by "unjustifiably treating Plaintiffs as criminals" and

14    "falsely reporting to LASD that Plaintiffs had or were suspected of engaging in criminal conduct."

15    Mot. at 33. That the Deputies may have acted in a way that was outside of the scope of Target's duty

16    of care is besides the point. Rather, a reasonable jury could find that Target employees acted

17    recklessly in pointing Plaintiffs out as suspects of the theft to LASD, and such a finding would not

18    be against the law because Target owes "customers a duty of care to avoid exposing them to

19    foreseeable harms." *Pool v. City of Oakland*, 42 Cal. 3d 1051, 1064 (1986) (noting that "a jury could

20    reasonably conclude that when Safeway reported to the police its unsupported suspicion that Pool's

21    $100 was counterfeit, it created a foreseeable risk that an innocent customer would suffer emotional

22    distress at the hands of the police").

23         Target's attempts to distinguish *Pool* do not change the fact that if Target employees were to

24    be found to have associated Plaintiffs with the Thieves primarily because of their race, Plaintiffs

---

26

27    [16] The Court does not make a finding on the reasonableness of the length of the detention, as it is only relevant
should probable cause exist. Nevertheless, the Court notes that Target provides no authority showing as a
matter of law that the LASD's additional detention was not reasonably foreseeable and therefore cannot be
28    considered as part of Target's detention of Plaintiffs.

would have a viable action for negligence. Counsel for Target argued in the hearing that the defendant in *Pool* conceded that it owed its customers a duty of care to avoid exposing them to foreseeable harms, making the case distinguishable. *Id.* But black letter law establishes that this is the ordinary duty of care that any person or entity owes others—*Pool* was just one such application of the well-known common law negligence standard in the context of a merchant and its customer. *See Ileto v. Glock Inc.*, 349 F.3d 1101, 1203–04 (9th Cir. 2003) (explaining that it is well-established by California courts "that one's general duty to exercise due care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct (including the reasonably foreseeable negligent conduct) of a third person"). Accordingly, the defendant did not concede anything that is not already clearly established in California law, and which Target can not reasonably dispute. And, based on the undisputed facts in this case, a jury is not precluded from making a finding that Target acted in a way that would foreseeably bring harm to Plaintiffs by falsely pointing them out as criminals to the police.

Therefore, the Court DENIES summary judgment as to the Fifth Cause of Action.

## F.  There are disputed issues of material fact with respect to Plaintiffs' Defamation Claim (Sixth Cause of Action)

To bring a defamation claim, a plaintiff must show that a defendant made "(1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure." *Wong v. Jing*, 189 Cal. App. 4th 1354, 1369 (2010). Target solely brings summary judgment on the argument this fourth element, which is that its statements were privileged because they were made reasonably, citing its prior arguments. Mot. at 38. As addressed previously, the Court finds that based on the undisputed facts, a jury could find that Targets statements about Plaintiffs to law enforcement were not made reasonably or in good faith. *See* Section IV.C, *supra*.

Accordingly, the Court DENIES summary judgment as to the Sixth Cause of Action.

/ / /

/ / /

**G.    There are disputed issues of material fact with respect to Plaintiffs' Claim for Declaratory and Injunctive Relief (Tenth Cause of Action)**

Target brings summary judgment on Plaintiffs' claim for declaratory and injunctive relief arguing that these are remedies, not causes of action. Mot. at 38. Target cites to non-binding authority for this statement, but in that case, the claim of declaratory relief was only dismissed because the plaintiff failed to establish an active controversy. *Parra v. Parra*, No. 20-cv-839-DMS-JLB, 2021 U.S. Dist. LEXIS 96739, at *8 (S.D. Cal. May 20, 2021). Here, the Court has denied summary judgment on the majority of the claims against Target, finding disputes of fact as to those claims, establishing an active controversy. Target cites no other authority on which the Court can find it proper to grant summary judgment on this cause of action.

Therefore, the Court DENIES summary judgment as to the Tenth Cause of Action.

**H.    There are disputed issues of material fact with respect to Plaintiffs' Excessive Force Claim (Seventh Cause of Action)**

The Deputies seek summary judgment on Plaintiffs' Seventh Cause of Action for excessive force in violation of 42 U.S.C. § 1983 on the basis that their use of force was reasonable. However, the Deputies have not shown there is no dispute of material fact in relation to this claim.

1.    <u>A reasonable jury could find that the Deputies did not use reasonable force</u>

"Police use of force is excessive and violates the Fourth Amendment if it's objectively unreasonable under the circumstances." *Zion v. County of Orange*, 874 F.3d 1072, 1075 (9th Cir. 2017). To ascertain whether a violation has occurred, courts balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). To ascertain the government interest at stake, courts consider the non-exhaustive *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The most important factor is whether the individual posed an immediate threat to the safety of officers or others. *Id*. However, the test is not "capable of precise definition of mechanical

1   application," and therefore the Court must consider "the objective facts and circumstances that

2   confronted the arresting officers." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

3        In determining the reasonableness of police conduct, courts must account "for the fact that

4   police officers are often forced to make split-second judgments–in circumstances that are tense,

5   uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation."

6   *Graham*, 490 U.S. at 396–97. "The 'reasonableness' of a particular use of force must be judged from

7   the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

8   *Id.* at 396. Moreover, the Ninth Circuit has repeatedly held that excessive force claims are fact-

9   specific and rarely appropriate for resolution on summary judgment. *See, e.g., Smith*, 394 F.3d at

10  701.

11                    a.      *Type and Amount of Force*

12       First, the Court assesses the quantum of force used against Plaintiffs.

13       As to Aaron, he alleges that Russell grabbed, squeezed, and shook his wrist for five to eight

14  seconds, causing his phone to fall on the ground. CSUF 13, 16. Subsequently, Mejia used a firm grip

15  on Aaron's arm and took him to a register, grabbed his arms tight and put them behind his back, and

16  pushed him down hard towards the conveyer belt, where he was held for approximately 15-20

17  seconds before he was handcuffed. CSUF 34, 35, 37. Aaron was escorted out to the patrol vehicle,

18  where Mejia closed the door on his foot. CSUF 41. The Ninth Circuit has held that "tight

19  handcuffing can constitute excessive force." *LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir.

20  2000). Whether there was tight handcuffing is disputed based on the facts before the Court, so

21  therefore at the summary judgment stage, the Court finds that the facts as to Aaron could potentially

22  lead to a finding of excessive force.

23       As to Kim, the extent of force alleged was that Russell held his wrists behind his back for a

24  short amount of time, at which point his left hip may have been pressed into the ledge of a register

25  and his backpack was digging into his back. CSUF 23, 25. These facts appear to be in dispute, and

26  viewing the facts in the light most favorable to Plaintiffs, the Court considers that some quantum of

27  non-lethal force was used against Kim. *See Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010)

28

1  (noting that the Ninth Circuit has "held that force can be unreasonable even without physical blows

2  or injuries").

3                              b.      *The Government's Interest*

4         Second, the Court applies the *Graham* factors to determine the strength of the government's

5  interest in the Deputies' use of force. Here, the County Defendants argue that the force used by the

6  Deputies was reasonable because Plaintiffs had been pointed out as suspects in a robbery, and they

7  were "physically and verbally protesting being detained." Mot. at 13. These go towards the first and

8  third *Graham* factors. The Court understands the County Defendants to be arguing that the Deputies

9  were merely using their inherent authority to use reasonable force to effectuate a detention of

10  Plaintiffs. *See Graham*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long

11  recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to

12  use some degree of physical coercion or threat thereof to effect it."). However, as explained next, the

13  Court finds that viewing the facts in light of Plaintiffs, there is a reasonable dispute of fact as to

14  whether the government had any interest in using force at all in this encounter. *Id.* (explaining that

15  proper application of the reasonableness test "requires careful attention to the facts and

16  circumstances of each particular case, including the severity of the crime at issue, whether the

17  suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

18  resisting arrest or attempting to evade arrest by flight.").

19                             i.   <u>Severity of crime</u>

20         The first factor does not clearly weigh in favor the government's use of force. It is

21  undisputed that the Deputies were responding to grand theft. CSUF 6. However, the Deputies did not

22  appear to have any information that the crime was violent, and although it is not clear whether the

23  Deputies personally knew this, Target employees had at least told the 911 operator that the ones who

24  physically committed the theft had already escaped.[17] Higgins Decl., Ex. D. And, at some point the

---

[17] The Court acknowledges that the Deputies may not have had information that the crime was non-violent either, but drawing all inferences in favor of Plaintiffs, the Court assumes that the Deputies knew at least what Target employees told the 911 operator. Moreover, it appears that the evidence points to the fact that the Deputies knew the crime was non-violent going in. ECF 57, Declaration of J. Bernard Alexander ("Alexander Decl."), Ex. 5 ("Mejia Depo") at 38:19-21.

1   Deputies did confirm that Plaintiffs had no weapons on them. Mejia Depo at 38:7-9. A jury could

2   find that upon arriving on the scene and finding a group of teenagers waiting there, the Deputies did

3   not have sufficient facts "to warrant the conclusion that [Plaintiffs were] [] particularly dangerous

4   criminal[s] or that [any] offense was especially egregious." *Smith*, 394 F.3d at 702. If so, this factor

5   does not necessarily support the government's interest in using force.

6                    ii.   Whether Plaintiffs posed an immediate threat

7          The second and most important factor of the *Graham* analysis also does not support the

8   Deputies' use of force. Rather, in its moving argument, the Deputies do not even argue that Plaintiffs

9   posed any threat, either to the Deputies themselves or anyone around them. It is on reply that the

10  County Defendants first state the Deputies faced an immediate threat—but present no actual facts to

11  support this.[18] Mot. at 32. At most, the County Defendants argue that there were other customers and

12  employees there, but present no facts as to why this is relevant or that Plaintiffs posed a threat to any

13  of those third parties. Mot. at 13.[19] Viewing the facts in the light most favorable to Plaintiffs, the

14  Deputies arrived to find three suspected teenage shoplifters waiting patiently for their arrival. The

15  teens then began verbally protesting that the Deputies were investigating them and filming the

16  encounter. Viewing the facts in this manner, the teenagers did not pose a threat at all and certainly

17  not one that would justify a use of force. The County Defendants have presented no facts that any

18  deputy on the scene felt threatened at all, or that Plaintiffs were a threat to anyone. Therefore, this

19  factor heavily weighs against the use of any force.

20         / / /

21

22  _____

23  [18] The County Defendants also stated that when they arrived, the Deputied had no information on whether the
    Teenage Shoppers had weapons or had made threats. This appears disputed. Nevertheless, common sense

24  would suggest that to the extent that the Deputies genuinely feared the possibility of weapons or threats, they
    had the opportunity to inquire about this in advance of approaching the Plaintiffs and likely did.

25  [19] And, to the extent that the County Defendants are arguing they were threatened because the Teenage
    Shoppers were a group of five people (although such an argument is not clearly made in the County

26  Defendants' briefing), the County Defendants provide no facts stating that the Deputies were significantly
    outnumbered in any way—rather, it appears that there were other deputies on the scene as well. CSUF 6.

27  Counsel for the County Defendants noted at the hearing that there was at least another deputy who left the
    Store early on. If so, a jury could determine that the Deputies did *not* think that the situation was threatening

28  at all upon their arrival.

iii.   Whether Plaintiffs resisted arrest

This third factor also does not clearly support a government interest in using force. As an initial matter, Plaintiffs complied with following Target's instructions to stay in the store and wait for LASD to arrive, which does not evidence any attempt to evade law enforcement. CSUF 8. Even assuming that Plaintiffs had verbally protested being detained, it is disputed that there were any physical attempts to resist arrest. While it is undisputed that Aaron starts backing away with his hands up at one point, it is not clear that he was being arrested. CSUF 12. Rather, it is undisputed that Aaron backed up because Russell started approaching him, in what a jury could find to be a rather sudden and aggressive fashion, and possibly with the intent of stopping his lawful filming of the encounter on his cell phone. *Id.* And even if Kim did try to step between Aaron and Russell, if it was unclear that Aaron was being detained and Russell was just aggressively approaching his friend, a jury could reasonably find that Kim did not attempt to interfere, but was just stepping in between to de-escalate the situation. Moreover, it is undisputed that once Plaintiffs were told they were being detained, they appeared to have both largely complied. CSUF 22, 24, 33. Accordingly, whether Plaintiffs actually resisted arrest is in dispute and does not weigh in favor of finding the use of force objectively reasonable.

c.   *Balancing of Interests*

Considering all the circumstances, a reasonable jury could conclude that the Deputies' actions towards Plaintiffs were excessive. While the Court considers that some degree of force was used on both Aaron and Kim, even if low, could still as a matter of law be found excessive, the County Defendants have not set forth any substantial government interest in using any force at all. Accordingly, the Deputies are unable to prevail on summary judgment on the undisputed facts.[20]

---

[20] Plaintiffs also argue to the extent liability is found as to either Deputy, they are liable for the excessive force of each other. Mot. at 25; *see Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (holding that, "consistent with other circuits' determination[s]. . . an officer may be liable under § 1983 under a theory of bystander liability"). The County Defendants did not respond to this point on Reply, although counsel clarified at the hearing that the County Defendants' did not believe there was a sufficient showing of acquiescence because each Deputy was preoccupied with their own actions at the relevant time. However, a jury could reasonably find that each Deputy was sufficiently aware of the other's actions, given their close physical proximity while effectuating the force.

2. <u>The Deputies are not entitled to qualified immunity</u>

The Deputies are not entitled to qualified immunity on Plaintiffs' excessive force claim based on the undisputed facts before the Court. As discussed above, taking the facts in the light most favorable to Plaintiffs, a jury could find that the Deputies used excessive force, against Plaintiffs' constitutional rights. Therefore, the inquiry turns to whether the right was "clearly established," such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he was confronted." *Young v. County of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011). Even if it were the case that there is no decided case on precisely the same facts that would place the Deputies on notice that their conduct was unconstitutional, a "materially similar case" is not necessary when faced with "'an obvious case.'" *White v. Pauly*, 580 U.S. 73, 79-80 (2017); *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (citing *Hope v. Pelzer*, 536 U.S.730, 738 (2002) for the proposition that where a constitutional violation "was 'obvious' that there need not be a materially similar case for the right to be clearly established").

The Ninth Circuit has held it is objectively unreasonable to apply non-trivial force where suspects pose "no *immediate* threat to the officers or public safety" at the time of the arrest, even where the suspect is "rude, uncooperative, and verbally abusive." *Andrews v. City of Henderson*, 35 F.4th 710, 719 (9th Cir. 2022). This is true even if a suspect had previously acted violently, or "where the officers *did* know that a suspect was armed." *Id.* at 719–20 (explaining that Ninth Circuit precedent "clearly establishes that [even] a suspect's previous violent conduct does not justify non-trivial force where the suspect poses no *immediate* safety threat").[21] Therefore, the Court does not find that qualified immunity applies at this stage.

Accordingly, the Court DENIES summary judgment as to the Seventh Cause of Action.

/ / /

/ / /

---

[21] Although the Court recognizes that the quantum of force used in this instance may be lower than in these cases, there also appears to be a corresponding lower level of government interest here than in those cases, as Plaintiffs did not act violently previously and were unarmed.

1    **I.      The County Defendants have met their burden with respect to Plaintiffs'**

2    **Unlawful Seizure Claim (Ninth Cause of Action)**

3            The County Defendants bring summary judgment as to Plaintiffs' unreasonable seizure

4    claim, arguing their detention of Plaintiffs' was reasonable. Plaintiffs appear to base this claim on

5    the same basis and standard as the excessive force claim, citing *Chew v. Gates*, 27 F.3d 1432 (9th

6    Cir. 1994). However, *Chew* was analyzing an unreasonable force claim. *Id.* at 1440. Here, the Court

7    finds the analysis of whether Plaintiffs were unconstitutionally detained separate from whether or

8    not the detention was carried out constitutionally. *See Thomas v. Dillard*, 818 F.3d 864, 874 (9th Cir.

9    2016) (analyzing unlawful seizure and excessive force claims under separate standards).

10          Although this is not clearly argued by the County Defendants, it appears that they are arguing

11   that the undisputed facts were sufficient to give them reasonable suspicion to detain Plaintiffs. Mot.

12   at 34.[22] Here, the Court finds that as a matter of law, the facts did give the Deputies reasonable

13   suspicion to conduct a *Terry* stop of Plaintiffs. *Thomas*, 818 F.3d at 875 ("*Terry* permits limited

14   police intrusions . . . when an officer's suspicion falls short of the 'probable cause' required to

15   execute an arrest or a 'full' search."). "To initiate a brief stop to investigate potential criminal

16   activity . . . an officer must have reasonable suspicion." *Id.* It is undisputed that Target employees

17   reported a theft to 911, identified a group still in the store as being involved, and then appeared to

18   have subsequently also told the Deputies upon their arrival that the Teenage Shoppers were involved

19   in the robbery.[23] This is sufficient to give the Deputies reasonable suspicion under the law to detain

20   Plaintiffs. *Navarette v. California*, 572 U.S. 393, 398 (2014) (holding that an anonymous call to 911

21   "bore adequate indicia of reliability" to give rise to reasonable suspicion).[24]

22

23   ────────────────

      [22] The Court notes that on reply, the County Defendants seem to argue based on a probable cause standard,
24   not reasonable suspicion. Mot. at 38.

25   [23] This latter fact is disputed by Target, but undisputed as between the County Defendants and Plaintiffs.
      CSUF 8. Therefore, the Court treats this as undisputed for the purposes of the County's Motion.

26   [24] At the hearing, counsel for Plaintiffs argued that a higher standard was needed to place a detainee in
      handcuffs and put them in a patrol car. However, the Court finds that the facts here are sufficient to meet even
27   probable cause. *See U.S. v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) ("Probable cause to arrest exists when
      officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable

28

1       Accordingly, the Court GRANTS summary judgment as to the Ninth Cause of Action.

2       **J.**    **The County has met its burden on the *Monell* Claim (Eighth Cause of Action)**

3       In *Monell*, the Supreme Court held that municipalities are "persons" subject to liability under

4  section 1983. *Monell v. Dept. of Soc. Serv. of N.Y.*, 436 U.S. 658, 690 (1978). For the municipality to

5  be liable, it must cause a constitutional violation, as a municipality cannot be held vicariously liable

6  under the theory of respondeat superior for the unconstitutional acts of its employees. *Id.* at 691. A

7  plaintiff seeking to hold a municipality liable may do so by alleging one of the following: (1) that a

8  municipal employee committed a constitutional violation pursuant to an expressly adopted official

9  policy or a longstanding practice or custom; (2) that a municipal employee was an official with final

10  policy-making authority; (3) that an official with final policy-making authority ratified a

11  subordinate's unconstitutional act. *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir.1992).

12       Here, the parties appear to agree that the policy at issue is based on an alleged failure to train.

13  Mot. at 41. To prevail on this theory, Plaintiffs must show a "longstanding practice or custom which

14  constitutes the 'standard operating procedure' of the local government entity." *Gillette*, 979 F. 2d at

15  1346. The custom must be so "persistent and widespread" that it constitutes a "permanent and well

16  settled" city policy. *Monell*, 436 U.S. at 691. "A section 1983 plaintiff may attempt to prove the

17  existence of a custom or informal policy with evidence of repeated constitutional violations for

18  which the errant municipal officials were not discharged or reprimanded." *Gillette*, 979 F.2d at 1349.

19       The County has set forth that LASD deputies are by policy, not allowed to use unreasonable

20  force and its deputies are trained as such. CSUF 49, 50, 51, 52. The burden therefore shifts to

21  Plaintiffs to show a genuine issue of material fact in support of this claim. Plaintiffs appear to agree

22  with these facts, instead arguing that this one instance of potential unreasonable force is sufficient to

23  show failure to train, and that Mejia did not timely submit a report of force. However, "generally, a

24  single instance of unlawful conduct is insufficient to state a claim for municipal liability under

25  section 1983." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1154 (9th Cir. 2021). And, Mejia's

26

27  caution to believe that an offense has been committed . . . by the person being arrested."). Plaintiffs have set

28  forth no disputed fact showing that there would be some reason Target's indication that Plaintiffs were involved in the crime would not be trustworthy to the Deputies.

timely submission of the report of force does not have anything to do with any policies on the use of force itself. Even assuming Mejia was not properly trained on the submission of written reports, this does not lead to any disputes on whether Mejia was properly trained to not use unreasonable force.

Accordingly, the Court GRANTS summary judgment as to the Eighth Cause of Action.

## CONCLUSION

For the foregoing reasons, the Court hereby ORDERS as follows:

1. The Motion for Summary Judgment is GRANTED as to Plaintiffs' Ninth Cause of Action for Unreasonable Seizure against Deputies Russell and Mejia;

2. The Motion for Summary Judgment is GRANTED as to Plaintiffs' Eighth Cause of Action under *Monell* as to the County;

3. The Motion for Summary Judgment is DENIED as to all other claims, namely as to Plaintiffs' First Cause of Action under the Unruh Act, Second Cause of Action under the Bane Act, Third Cause of Action under the Ralph Act, Fourth Cause of Action for False Imprisonment, Fifth Cause of Action for Negligence, Sixth Cause of Action for Defamation, Tenth Cause of Action for declaratory and Injunctive Relief, and Seventh Cause of Action for Excessive Force.

**IT IS SO ORDERED**.

Dated December 1, 2023

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge